**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

RICHARD R. PARK,

           Plaintiff,

vs.

DAVID HILL,

           Defendant.

No. C 03-3044-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  A. *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *1.*   *Hill's offer to buy the Bank* . . . . . . . . . . . . . . . . . . . 4
    *2.*   *The board response* . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *3.*   *Hill's further attempts to buy the Bank* . . . . . . . . . . . . 6
    *4.*   *The board's decision not to negotiate with Hill* . . . . . . . . . 8
    *5.*   *Hill's "fresh approach"* . . . . . . . . . . . . . . . . . . . . . 9
    *6.*   *The allegedly defamatory letter* . . . . . . . . . . . . . . . . 10
  B. *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    *1.*   *The Complaint and Answers* . . . . . . . . . . . . . . . . . . . 14
    *2.*   *The motions for summary judgment* . . . . . . . . . . . . . . . 14
  C. *Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    *1.*   *Hill's opening argument* . . . . . . . . . . . . . . . . . . . . . 16
    *2.*   *Park's resistance* . . . . . . . . . . . . . . . . . . . . . . . . . 17
    *3.*   *Hill's reply* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    *4.*   *Oral arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II. *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  A. *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . 20
  B. *Defamation And Qualified Privilege* . . . . . . . . . . . . . . . . . . . . 22
    *1.*   *Defamation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

|  |  | a. | Definition and rationale . . . . . . . . . . . . . . . . . . . | 22 |
|  |  | b. | Requirements for proof . . . . . . . . . . . . . . . . . . . | 23 |
|  | 2. | "Opinion" and "truth" . . . . . . . . . . . . . . . . . . . . . . | 25 |
|  | 3. | Qualified privilege . . . . . . . . . . . . . . . . . . . . . . . | 26 |
|  |  | a. | Invoking the qualified privilege . . . . . . . . . . . . . . | 27 |
|  |  | b. | Defeating the qualified privilege . . . . . . . . . . . . | 28 |
| C. | Were Hill's Statements Qualifiedly Privileged? . . . . . . . . . . | 29 |
|  | 1. | Privileged "occasions" . . . . . . . . . . . . . . . . . . . . . | 30 |
|  |  | a. | The "protection of the publisher's interest" privileged occasion . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 |
|  |  |  | i.  Section 594 . . . . . . . . . . . . . . . . . . . . | 31 |
|  |  |  | ii. Applicability here . . . . . . . . . . . . . . . . . | 33 |
|  |  | b. | The "common interest" privileged occasion . . . . . . . | 37 |
|  |  |  | i.  Section 596 . . . . . . . . . . . . . . . . . . . . | 37 |
|  |  |  | ii. Applicability here . . . . . . . . . . . . . . . . . | 39 |
|  | 2. | Abuse of the privilege . . . . . . . . . . . . . . . . . . . . . | 41 |
|  |  | a. | Bad faith . . . . . . . . . . . . . . . . . . . . . . . . . | 42 |
|  |  | b. | Actual malice . . . . . . . . . . . . . . . . . . . . . . . | 43 |

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Is the plaintiff, the former president and chief executive officer of a rural bank, attempting to make a defamation claim out of statements that did no more than hurt his feelings, or did the defendant make statements about the plaintiff that were defamatory *per se*, when the defendant's tender offer for the shares of the bank was thwarted? The plaintiff contends that the defendant defamed him when the defendant stated in a letter to shareholders, written after the defendant learned that the bank's board had accepted another buyer's offer to buy the bank, that the plaintiff had, "in an apparent abdication of his fiduciary duty," impeded the defendant's access to shareholders and

directors. On a motion for summary judgment, the defendant contends that whether his statements were defamatory or defamatory *per se*, they were, as a matter of law, subject to a qualified privilege. He contends, further, that the plaintiff cannot generate a genuine issue of material fact that the statements were made with actual malice to show that he abused the qualified privilege. The plaintiff contends, however, that a reasonable juror could find that the defendant abused the qualified privilege, if it applied at all, by making statements in bad faith and knowing disregard of their falsity, so that the plaintiff is entitled to a jury trial on his defamation claim. The court must decide whether the plaintiff's defamation claim should go to a jury or whether the defendant is, instead, entitled to summary judgment.

## I. INTRODUCTION

### A. Factual Background

This diversity litigation arises from defendant David Hill's unsolicited offer, sent directly to shareholders on May 23, 2002, to buy a controlling interest in the Hancock County Bank & Trust in Garner, Iowa (the Bank), and the response by plaintiff Richard Park, who was the president, chairman of the board, and a shareholder of the Bank, to that unsolicited offer. The court will not attempt here an exhaustive dissertation of the undisputed and disputed facts in this case or every twist and turn in the process that led to the eventual sale of the Bank to another buyer. Rather, the court will identify the core of undisputed facts and sufficient of the disputed facts to put in context the parties' arguments for and against summary judgment.

### 1. Hill's offer to buy the Bank

On May 23, 2002, Hill Investment Company, an Iowa corporation controlled by Hill, sent an unsolicited tender offer to the Bank's shareholders to purchase up to 100% of the outstanding shares of the Bank for $4,000.00 net per share. The offer stated that it would expire on June 3, 2002, at 5:00 p.m. The offer was expressly contingent upon gaining a controlling interest in the bank. *See* Defendant's Appendix, Exhibit 1. At the time of the offer, Hill had only slight contact with Garner, Iowa, where the Bank was located. Hill determined the book value of the Bank's stock from "call reports," to which he had access at the time. Such "call reports" are public records that, as Hill explained in deposition, are filed with bank regulators on a quarterly basis and provide "information relative to assets, liabilities, and the composition of earnings of the bank." As Hill also explained in deposition, he wanted the tender offer to move "rather quickly and force decisions on people who might be slow to make decisions"; hence, the short period of time for shareholders to respond to the offer. Plaintiff's Supplemental Appendix at 17. After making his tender offer, Hill spent many days in Garner attempting to talk to shareholders and directors about his offer.

### 2. The board response

Hill's tender offer was not well received by the Bank's board of directors. By letter dated May 29, 2002, and signed by Park in his capacity as chairman of the board, the board notified shareholders that it "unanimously recommend[ed] that stockholders reject the Offer and urge[d] [shareholders] not to tender any of [their] shares." Defendant's Appendix, Exhibit 3. The board stated that it believed Hill's offer was, *inter alia*, "inadequate," would result in a loss of local ownership, provided an "excessively short" time to respond, and was "excessively conditional." *Id.* The May 29, 2002, letter also outlined the board's course of action in response to Hill's offer:

At a meeting of the Board held on May 29, 2002, the Board authorized and directed management to explore various possible alternatives that would be designed to maximize the value of shares in the Bank, including without limitation, possible sales of Bank stock to third parties, possible repurchases of shares by the Bank, possible dividends to the Bank's stockholders and possible acquisitions. At the meeting the Board also authorized and directed management to seek and retain the assistance of an independent professional firm to assist it in exploring these alternatives. Of course, there can be no assurances that any transaction will be recommended or consummated.

*Id.* On June 5, 2002, the board held another meeting to discuss strategies in response to Hill's hostile tender offer. According to the minutes of that meeting, the board "decided the best possible strategy would be to ask shareholders to sign an agreement whereby they would agree not to tender their shares to David Hill and [to] act cooperatively in marketing their stock for fair market value." Defendant's Appendix, Exhibit 5. The board also decided to keep this effort confidential, to prevent Hill from responding to it. *Id.*

Thereafter, Howard Hagen, the attorney hired by the board to assist with attempts to find other buyers for the Bank, assembled a "bid book," consisting of the Bank's performance and financial data, which was intended to assist potential bidders in formulating a bid. Some of the information in that "bid book" was confidential, although much of it came from public records. The Bank required potential bidders to sign a confidentiality agreement to obtain the "bid book." However, Hill was never offered the "bid book"; indeed, Hagen testified that he was "instructed [by Park] not to invite [Hill]" to what was described as "the party," *i.e.*, that he was instructed not to invite Hill to participate in further discussions to purchase the Bank or to provide Hill with the "bid book." Defendant's Appendix, Exhibit 10. Hill and his attorney, Greg Page, contend that

they made numerous oral requests for the "bid book," but were never given those materials. Park contends that Hill never requested additional information about the Bank.

### 3. *Hill's further attempts to buy the Bank*

By a letter to shareholders dated June 6, 2002, Hill extended the deadline to accept his offer to and including June 21, 2002, but did not increase the offered price per share or other terms of his offer. *See id.*, Exhibit 4. Hill explained in his letter that the reasons for the extension were "delays in Bank shareholders receiving the Offer that arose as a result of the Memorial Day weekend as well as the refusal of the Bank's management to provide a Bank shareholder supporting our offer with a current list of Bank shareholders and their addresses." *Id.* Hill also expressed his disappointment with the response from the Bank's board of directors, adding, "Given the fact that the Offer will result in the highest price ever paid for such stock and will be substantially more than the price paid by the Bank or the Bank's management in acquiring such stock, we believe the Bank management's response was not truly in the best interests of the Bank or its shareholders." Defendant's Appendix, Exhibit 4.

Hill testified in deposition that he had been required to work from a very out-of-date list of shareholders. Plaintiff's Supplemental Appendix at 17.[1] Notwithstanding the

---

[1]Hill failed to respond to Park's Statement of Facts, filed as part of Park's resistance to Hill's summary judgment motion. Park's Statement of Facts contains the statement that Hill and his attorney "had several lists which gave the identity and addresses of the bank shareholders." Plaintiff's Statement Of Material Facts Submitted In Resistance To Defendant's Motion For Summary Judgment, ¶ 6. Because Hill failed to respond, the court could deem Park's statements of additional facts to be admitted. *See* N.D. IA. L.R. 56.1(d). However, the court finds that Hill's deposition testimony does not support Park's contention that Hill had access to "several lists" of shareholders, because Hill actually testified, "I had a lot of trouble determining who the shareholders of that bank were. I was

(continued...)

refusal of the board to provide him or his associates with a complete list of current shareholders, Hill testified that he was able to talk about his tender offer with thirty or forty people that he had identified as shareholders or interested persons. Hill also testified that he attempted to talk to two board members besides Park, but board member Jim Jass "refused to speak" to him, and board member Jerry Nedved "told [him] nothing." Plaintiff's Supplemental Appendix at 20.[2] Thereafter, Hill did not attempt to contact any board members other than Park. Hill pursued private negotiations with Park in an attempt

---

[1](...continued)
able to come up with a very dated document which included a shareholders list, but it was—it was a few years out of date," adding later, "I didn't know any shareholders. I didn't know anybody." Plaintiff's Supplemental Appendix at 17. Hill's testimony that he had, at most, one outdated list of shareholders plainly does not support the assertion that he had "several lists" of shareholders. The court finds that it is not required to deem to be admitted factual statements that are not fairly supported by the record evidence on which those factual statements are purportedly based.

[2]Again, Park's Statement of Facts includes the statements that "Hill spoke with Board member, Jim Jass" and that "Hill met with Board member Jerry Nedved." *See* Plaintiff's Statement Of Material Facts Submitted In Resistance To Defendant's Motion For Summary Judgment, ¶¶ 17 & 18. These characterizations of Hill's contacts with Jass and Nedved suggest that Hill had substantive contacts with board members other than Park. Certainly, they omit the fact that the contacts were not substantive. However, Hill's deposition testimony, cited in the pertinent paragraphs of Park's Statement of Facts, clearly shows that those incidents of Hill's attempts to "speak with" or "meet with" these board members were either rebuffed or fruitless. Specifically, Park's Statement of Facts does *not* reveal that Hill testified that Jass "refused to speak" with him, or that Hill testified that Nedved "talked to [Hill]; he didn't talk with [Hill]" or that Nedved "told [Hill] nothing." Plaintiff's Supplemental Appendix at 20. Thus, Park's Statements of these particular facts is not fairly supported by the record evidence on which they were purportedly based. Therefore, the court will not deem these factual statements to be admitted. Rather than rely on Park's misleading characterizations of Hill's contacts with Jass and Nedved, the court has quoted Hill's actual testimony, upon which Park purportedly relied for his characterization.

to obtain Park's shares as well as his support for Hill's tender offer. Those negotiations involved offers of additional consideration beyond the share price in the tender offer made to other shareholders. Park and Hill never came to terms on any separate agreement.

Hill's attempts to purchase the Bank continued through the summer of 2002. Those efforts included continued contacts with Park, but never included an increase in the price that Hill was offering for the Bank's shares. During the same time period, the board of directors of the Bank was actively seeking and considering offers from other potential buyers. Although Hill was not so informed by Park or the board, Hill became aware that the board was making efforts to find another buyer for the Bank.

### 4. The board's decision not to negotiate with Hill

At some point in August or September, Park asserts that he did recommend that the board meet with Hill to discuss Hill's attempt to purchase the Bank. However, at a special meeting on September 12, 2002, the board decided not to meet with Hill. The pertinent entry in the minutes of that board meeting state the following:

> The Board concluded with a discussion regarding Hill's ongoing issues and tactics. His inconsistent statements were reviewed and various issues and concerns were raised regarding Hill's tactics, statements, and intent. Board members saw no point in meeting with Hill for several reasons. First, Mr. Hill's entire approach to the Board was one of stealth and secrecy. Contrary to Mr. Hill's assertion, several Board members did not believe that Hill would really keep the Bank local, given his track record (he sold his own local bank) and because he now owns a bank in West Des Moines which is in search of deposits such as those held by Hancock. In fact, Mr. Hill became familiar with Hancock through participation with the Bank and saw its sizeable deposit base structure. Consequently, the Board concluded that any elements of confidence in Mr. Hill had been evaporated during the experience of the last three months.

Plaintiff's Supplemental Appendix at 88. Although the board decided not to meet with Hill, it did consider the offers of a number of other interested purchasers and voted to authorize Park to obtain a revised proposal from Liberty Bancshares, Inc., concerning its offer to pay $5,600.00 a share for 70% of the shares of the Bank. *Id.* at 87-88. The minutes of a subsequent meeting on September 18, 2002, reflect that the board voted to accept and recommend a proposal from Liberty Bancshares to purchase no less than 70%, and up to 100%, of the stock of the Bank for $5,600.00 per share. *Id.* 91.

###### 5. Hill's "fresh approach"

Hill was unaware of the board's September 18, 2002, decision to accept and recommend the offer from Liberty Bancshares. Therefore, on that same day, he wrote another letter to shareholders of the Bank proposing what he described as a "fresh alternative." That letter, in its entirety, is as follows:

> Dear Friends of the Hancock County Bank and Trust,
>
> You are all aware of my continuing efforts to acquire a majority interest in your bank. This process has been unnecessarily difficult and [has] caused some unfortunate division and acrimony.
>
> Nonetheless, I have been very pleased with the support we have received, the people we have met, and the amazing loyalty to your community bank.
>
> I have a concern that an aggressive auction process, which is occurring at the present time, will cause a result that is not in the best interest of the bank, its shareholders, its employees, or the community of Garner.
>
> However, I am advocating today a fresh alternative that will allow everyone to achieve a better result. I am proposing to

form a one-bank holding company to own only shares in the Hancock County Bank and Trust and to offer many of you the alternative of sharing that ownership with me. The enclosed projections will document very clearly the investment advantage available to us. In addition, I will provide a buy-sell agreement for your protection along with some assurances of liquidity if you should desire to sell your interest.

THE BONUS: You will be able to retain your independent community bank which will protect the existing directors and employees and serve as an economic engine for the good of the greater Garner area.

Please give this proposal the serious consideration that I believe it deserves.

Defendant's Appendix, Exhibit 13.

On September 25, 2002, several shareholders published a letter to the editor in the Garner Leader newspaper expressing concern and a number of questions about how the proposed sale of the Bank was being handled by the board. *See id.*, Exhibit 14. Park testified in deposition that he believed that "the whole letter was probably a shot at [him] personally and the board of directors." *Id.*, Exhibit 15, p. 19. The board of directors of the Bank did not respond to Hill's "fresh approach," however.

### 6. *The allegedly defamatory letter*

As of October 1, 2002, Hill had been tendered 26% of the shares of the Bank. However, by that time, he had learned of the board's recommendation that the competing offer from Liberty Bancshares should be accepted. He then authored the letter containing the allegedly defamatory statements upon which the present lawsuit is based. The parties agree that two versions of the letter were disseminated: one to shareholders who had tendered their shares to Hill, and one, without the first paragraph quoted below, to other

persons Hill believed were "interested" in the Bank. The more complete version of the letter, in its entirety, with allegedly defamatory statements in italics, follows:

Dear Friends of Hancock County Bank and Trust ("Bank"):

I would like to personally thank you again for responding favorably to the proposal that I had made earlier this year to acquire your shares of the Bank.

By now you have all probably received a letter from the Bank indicating that it has reached an agreement with Liberty Savings Bank (a thrift institution located in West Des Moines, Iowa) to acquire the Bank. We believe that this acquisition (as are most acquisitions by Liberty Bank) will be made through the form of a merger or purchase and assumption transaction in which the Bank will become merely an office of a thrift institution headquartered in West Des Moines, Iowa. Your local ownership will be gone and the Bank's future policies, procedures and direction will be dictated by individuals located in central Iowa and not in your local community.

While the amount per share proposed to be paid for the Bank is greater than the price that I had offered, it is significantly below the price that Richard Park had indicated to me was necessary for a sale of the Bank. You should also be aware of the following:

1.     I was never provided any information with respect to the Bank which would allow me and my advisors to further evaluate any appropriate purchase price. Apparently your Board solicited proposals from 14 other "interested parties" but neglected to solicit any further proposal from me, an obviously interested party;

2.     *Your president, Richard Park, prevented me from having any contact with the Board of*

*Directors of the Bank* in order to allow me to present my proposals for the future of the Bank as a locally owned and independent community bank;

3. *Mr. Park, in an apparent abdication of his fiduciary duty, also impeded any discussions between myself and shareholders of the Bank*;

4. Mr. Park, upon receiving information regarding my offer, immediately transmitted a letter to the shareholders of the Bank indicating that the Bank should not be sold and that local control should be maintained. In fact, Mr. Park has taken exactly the opposite approach and the Bank will no longer be locally owned and will apparently be relegated to existence as an office of a thrift; and

5. Several local jobs will likely be lost if the operations of the Bank are consolidated with the West Des Moines based thrift.

If I had had an opportunity to visit with the Board of Directors (which I requested on numerous occasions), I was also prepared to make an alternative proposal which would have allowed local shareholders to join with me in acquiring the Bank, thereby ensuring local ownership and direction for the Bank for the foreseeable future.

Since the proposed transaction with Liberty Bank must still receive shareholder and regulatory approval (neither of which are assured) and since there are a significant number of shareholders, who, once they realize that your Board of Directors has avoided its responsibility and ignored the desire of the majority of the shareholders of the Bank to remain as a locally owned and independent bank, this proposal may still

fail. Consequently, Wells Fargo Bank, as Escrow Agent in my cash offer for shares, will continue to retain your shares until such time as it appears that the proposed transaction will be completed. At that time, I will cause the shares to be released so that you will be able to share in the additional purchase price to be received for the sale of your Bank to outsiders. *Perhaps Richard Park should make the same offer to those minority shareholders whose stock he has acquired in recent months for amounts significantly less than I offered.*

In the meantime, *you should feel free to communicate to the Bank your disappointment with the direction taken by your Board of Directors and their evident lack of responsibility and sensitivity to the real concerns of the Bank's shareholders.*

Defendant's Appendix, Exhibit 18 (emphasis added). Although Park admits that this letter was only sent to shareholders, copies of it were obtained by other members of the community in Garner. Hill has testified that he was frustrated and tired of the process at the time that he learned of the board's decision to recommend Liberty Bancshares' offer. Plaintiff's Supplemental Appendix at 49. However, the October 1, 2002, letter does not withdraw Hill's offer.

On January 29, 2003, a majority of the shareholders of the Bank voted in favor of a merger with Liberty Bancshares that involved a final closing purchase price for the Bank of $6,000 per share. Shortly after that deal was completed, Park filed the present defamation suit against Hill, basing his claim on statements in the October 1, 2002, letter. Hill contends that Park has suffered, and claims, no actual damages as a result of the October 1, 2002, letter. Park, however, contends that the letter is defamatory *per se*, so that damages are presumed. Consequently, no evidence of any damage to Park resulting from the alleged defamation was introduced into the summary judgment record.

## B. Procedural Background

### 1. The Complaint and Answers

Park filed the present lawsuit on May 19, 2003, invoking the court's diversity jurisdiction, because he is now a citizen of Kansas, while defendant Hill is a citizen of Iowa. The Complaint asserts a cause of action for "libel" and alleges that the following statements in Hill's October 1, 2002, letter to shareholders of the Bank are defamatory *per se*: (1) "Your President, Richard Park, prevented me from having any contact with the Board of Directors of the bank. . . ."; (2) "Mr. Park, in an apparent abdication of his fiduciary duty, also impeded any discussion between myself and shareholders of the bank"; (3) "Perhaps Richard Park should make the same offer to those minority shareholders whose stock he had acquired in recent months for an amount significantly less than I offered"; and (4) "You should feel free to communicate to the [B]ank your disappointment with the direction taken by your Board of Directors and their evident lack of responsibility and sensitivity to the real concerns of the bank's shareholders." Complaint (docket no. 1), ¶¶ 9, 11-18.

Hill answered Park's Complaint on July 23, 2003 (docket no. 6), then filed a First Amended And Substituted Answer and Counterclaim on June 15, 2004 (docket no. 21). Hill's Counterclaim against Park was for intentional interference with a prospective business advantage, that is, the purchase of the shares of the Bank. Park filed a reply to Hill's Counterclaim on June 22, 2004. Trial in this matter was set to begin on August 15, 2005.

### 2. The motions for summary judgment

On November 23, 2004, Park filed a motion for summary judgment on Hill's Counterclaim (docket no. 35). On December 15, 2004, Hill filed a Second Amended And Substituted Answer, Affirmative Defense, And Counterclaim (docket no. 49). However,

on March 4, 2005, Hill filed a motion for leave to dismiss his Counterclaim (docket no. 61), explaining that dismissal of the Counterclaim was being made "at the conclusion of the mediation herein." Therefore, by order dated July 21, 2005 (docket no. 78), the court granted Hill's motion to dismiss the Counterclaim and denied as moot Park's motion for summary judgment on that Counterclaim.

On March 4, 2005, Hill also filed the motion for summary judgment on Park's defamation claim (docket no. 60), which is now before the court. Park resisted that motion on April 15, 2005 (docket no. 71), and Hill filed a reply in further support of his motion on April 20, 2005 (docket no. 75). Although Hill did not request oral arguments on his motion for summary judgment, Park did in his resistance.

Unfortunately, owing to the court's involvement during April, May, and June in the second death-penalty case on its docket, *United States v. Angela Johnson*, CR 01-3046-MWB (N.D. Iowa), its prior involvement in its first death-penalty case during the preceding fall and winter, *United States v. Honken*, CR 01-3047-MWB (N.D. Iowa), and the resulting backlog of criminal cases with speedy trial requirements, this case cannot be reached for trial on August 15, 2005. Therefore, the court was forced to continue the trial in this matter to April 3, 2006, the first available date in its crowded docket that could be coordinated with the parties' schedules. The court, has, however, attempted to expedite resolution of Hill's motion for summary judgment, as soon as the court's schedule permitted. Therefore, the court set oral arguments on Hill's motion for summary judgment for July 28, 2005.

At the oral arguments, plaintiff Park was represented by Gary Mattson of LaMarca & Landry, P.C., in Des Moines, Iowa. Defendant Hill was represented by Nick Critelli of Nicholas Critelli, P.C., in Des Moines, Iowa. Hill's motion for summary judgment is now fully submitted.

### C. Arguments Of The Parties

#### 1. Hill's opening argument

As his first ground for summary judgment on Park's defamation claim, Hill argues that he is entitled to invoke, and Park cannot defeat as a matter of law, the common or shared interest qualified privilege for his statements in the October 1, 2002, letter, even if those statements are somehow defamatory. He contends that there is no genuine issue of material fact that his letter of October 1, 2002, was a communication by him to shareholders with whom he had been negotiating for the purchase of their stock, and that the statements in the letter were made in good faith. He contends that the letter was intended to convince shareholders not to approve the sale of the Bank's shares to Liberty Bancshares, as recommended by the board of directors and, instead, to continue negotiations with him, in light of the legitimate questions he raised about conduct of Park and the board. He points out that the same concerns about the conduct of Park and the board had already surfaced in the letter to the editor in the Garner Leader newspaper. He also asserts that there is no genuine issue of material fact that he had an interest, right, duty, or obligation concerning the sale and purchase of the Bank's shares, where he had obtained control of 26% of those shares and he was still actively negotiating with the board and shareholders for the purchase of additional shares. Hill also contends that, as a matter of law, the shareholders who received the October 1, 2002, letter had a corresponding right, duty, or obligation in the subject matter of the letter, because they had to determine whether or not to support the board's recommendation or to pursue a deal with him. He contends that no legitimate argument can be made that the privilege was defeated, because Park cannot generate any genuine issue of material fact that he made the statements in the letter with actual malice.

As his second ground for summary judgment, Hill contends that Park cannot satisfy the heightened requirements for proof of a defamation claim where Park is a public figure and the subject of the October 1, 2002, letter involved a matter of public controversy. Specifically, he contends that Park, as the CEO of the town's only bank, embroiled in a public dispute over whether the Bank would remain locally controlled or not, which had generated letters to the editor, was a public figure. He contends, further, that Park cannot prove either "actual malice" or damages as required to prevail on a defamation claim involving a public figure and a public controversy. At most, Hill contends that Park has "hurt feelings" as the result of legitimate questions about his conduct in a public controversy.

Finally, Hill asserts that there is no genuine issue of material fact as to the truth of his statements in the October 1, 2002, letter, so that he has an absolute defense to Park's defamation claim. He contends that Park had, himself, recognized that he had a duty not to "lock out" any potential bidder, including Hill, but that there is no genuine issue of material fact that Park did precisely that by instructing that Hill be excluded from the bidding process.

### 2. Park's resistance

In his resistance to Hill's motion for summary judgment, Park contends that he is not a "public figure," and the sale of the Bank was not a matter of "public controversy." Park contends that there is no evidence that he thrust himself to the forefront of a particular public controversy in order to influence resolution of the issues involved. He contends that the sale of the Bank was, instead, a purely private matter and that interest was limited to the board of directors and certain stockholders. That being so, he contends that he could not have been a "public figure." Moreover, he contends that his efforts to influence the outcome of the sale of the Bank were limited to the private sphere—indeed, to his fiduciary

duty—of trying to get the best result for the Bank's shareholders. Therefore, he contends that he is not required to prove that Hill acted with "actual malice."

Next, Park contends that there is at least a jury question as to whether Hill can rely on a qualified privilege to escape liability for his defamatory statements, because there are genuine issues of material fact as to whether or not Hill made the defamatory statements in privileged circumstances and whether or not he acted in bad faith. Park contends that there was no privileged communication, because Hill was not a shareholder and that, by the time of the October 1, 2002, letter, Hill was no longer negotiating for the purchase of the Bank, because the board had approved another offer, and Hill testified that he was ready to "back off." Thus, Park contends that there was no legitimate purpose for Hill's defamatory statements. Park contends that the situation here is analogous to a competition for customers, which does not give rise to privileged communications. Park contends that the record also shows, or at least gives rise to a reasonable inference, that Hill made the defamatory statements in bad faith and with actual malice, in light of Hill's contradictory conduct, and evidence that he knowingly disregarded the falsity of his statements.

Finally, Park contends that Hill is not entitled to summary judgment on the basis of the "truth" of his statements. Park contends that Hill's statements are defamatory *per se* because they impugned Park's business, trade, profession, or office. Thus, Park asserts that he is not required to prove falsity, but Hill must, instead, prove truth as an affirmative defense. Park contends that Hill's assertion that Park breached his fiduciary duty is false, because Hill made numerous attempts to and did contact members of the board and shareholders, and on one occasion, Hill lauded Park's concern for his shareholders.

### 3.    *Hill's reply*

In reply, Hill contends that this is not even remotely a case of "competition," to which the common interest privilege does not apply, but one in which he was negotiating with Park, the board, and shareholders to purchase the Bank. He contends that, if Park was "competing" with him concerning the purchase of the Bank, then Park breached his fiduciary duty to obtain the best deal for shareholders. Moreover, he contends that, because he controlled 26% of the shares of the Bank and was still negotiating for a controlling interest, he and the shareholders had business dealings with one another, and the Liberty deal reasonably appeared to be a matter of interest to the group, he and the shareholders of the Bank had a common interest in the proposed transaction with Liberty Bancshares.

### 4.    *Oral arguments*

Although his briefs were silent on the matter, Hill asserted during oral arguments that at least one of the allegedly defamatory statements was an "opinion," and thus, could not be the basis for a defamation claim. He contends that the statement in the October 1, 2002, letter, "Mr. Park, in an *apparent* abdication of his fiduciary duty, also impeded any discussions between myself and shareholders of the Bank," is merely a statement of opinion, as plainly indicated by insertion of the word "apparent" prefacing the observation about breach of fiduciary duty. At oral arguments, Park responded that insertion of the word "apparent" is not sufficient to turn a defamatory statement into an "opinion," citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). The court would not even mention, let alone consider, such an argument raised for the first time only during oral arguments, *cf. Bunda v. Potter*, 369 F. Supp. 2d 1039, 1055-56 (N.D. Iowa 2005) (the court need not consider an issue raised for the first time in a reply), were it not for the fact that defense counsel was obviously prepared to meet it.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

The parties here agree generally on the standards applicable to a motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377 (same).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond

the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994). Finally, this court has repeatedly taken note of the rule in this circuit that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *See, e.g., Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)).

The court will apply these standards to Hill's motion for summary judgment on Park's defamation claim.

## B. Defamation And Qualified Privilege

### 1. Defamation

#### a. Definition and rationale

As this court has explained in a number of decisions, defamation under Iowa law consists of the "twin torts" of "libel" and "slander," where "libel" is defined as malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose the person to public hatred, contempt, or ridicule, or to injure the person in the maintenance of the person's business, and "slander" is defined as oral publication of defamatory material. *Lyons v. Midwest Glazing, L.L.C.*, 235 F. Supp. 2d 1030, 1043-44 (N.D. Iowa 2002) (citing cases of this court and the Iowa Supreme Court); *accord Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004). The Iowa Supreme Court has recently reiterated the rights and policies protected by a "defamation" claim:

> As we have previously explained,
>> [t]he law of defamation embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks. An action for defamation or slander is based upon a violation of this right.
>> The gravamen or gist of an action for defamation is damage to the plaintiff's reputation. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation. Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest

> in his reputation and good name. A cause of action for
> defamation is based on the transmission of derogatory
> statements, not any physical or emotional distress to
> plaintiff which may result. Defamation law protects
> interests of personality, not of property.
>
> *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa
> 1998) (quoting 50 Am. Jur. 2d Libel and Slander § 2, at
> 338-39 (1995)).

*Kiesau*, 686 N.W.2d at 174-75.

### b. Requirements for proof

In order to prevail on a defamation claim, a plaintiff must ordinarily show more than "'hurt feelings.'" *Kiesau*, 686 N.W.2d at 175 (quoting *Johnson*, 542 N.W.2d at 513, in turn citing 53 C.J.S. *Libel and Slander* at § 5)). Rather, a plaintiff must ordinarily prove that the statements were made with malice, were false, and caused damage. *Lyons*, 235 F. Supp. 2d at 1044; *Kiesau*, 686 N.W.2d at 175 ("In cases of libel per quod, 'a plaintiff must ordinarily prove some sort of cognizable injury, such as injury to reputation.' *Johnson [v. Nickerson]*, 542 N.W.2d [506,] 513 [(Iowa 1996)] (citing 53 C.J.S. Libel and Slander § 6 (1987))."); *Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004) (noting that defamation ordinarily requires proof of actual damages); *Schlegel*, 585 N.W.2d at 222 (explaining that these are the elements of proof for defamation *per quod*).[3] Although statements constituting "defamation *per se*" are actionable without proof of

---

[3]When a "private figure" claims defamation by a media defendant, the private plaintiff does not have to prove "actual malice," but must only establish "that the media defendant negligently breached a professional standard of care in order to recover actual damages." *Johnson*, 542 N.W.2d at 511. "Public figure" plaintiffs, on the other hand, must *always* prove "actual malice" and must do so by "clear and convincing evidence," not merely by the greater weight of the evidence, to prevail on a defamation claim against any defendant, media or otherwise. *Kiesau*, 686 N.W.2d at 177.

malice, falsity, or special harm, *see Mercer v. City of Cedar Rapids*, 104 F. Supp. 2d 1130, 1170 (N.D. Iowa 2000) (citing the court's prior cases and Iowa cases); *accord Kiesau* 686 N.W.2d at 175 ("In statements that are [defamatory] *per se*, falsity, malice, and injury are presumed and proof of these elements is not necessary."); *Barreca*, 683 N.W.2d at 116 (same), words are defamatory *per se* only if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have defamatory effect. *Id.*; *Barreca*, 683 N.W.2d at 116. Among such statements are defamatory imputations affecting a person in his or her business, trade, profession, or office. *Id.* Also, "'[a]n attack on the integrity and moral character of a party is [defamatory] *per se*.'" *Kiesau*, 686 N.W.2d at 175 (quoting *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 139 (Iowa 1996)); *see generally Barreca*, 683 N.W.2d at 116 (noting that "[o]ver the years, we have characterized a variety of statements as slander per se").

The court must pause for a moment to consider one of the four allegedly defamatory statements at issue in this case. The parties have offered no specific arguments, at all, regarding the third statement, "Perhaps Richard Park should make the same offer to those minority shareholders whose stock he had acquired in recent months for an amount significantly less than I offered." *See* Defendant's Appendix, Exhibit 18 (allegedly defamatory letter); Complaint (docket no. 1), ¶¶ 9, 11-18 (cataloguing allegedly defamatory statements in the October 1, 2002, letter). The reason may be readily apparent: This statement simply is not defamatory. The factual inference, that Park had obtained shares from minority shareholders in recent months for an amount significantly less than Hill offered, lacks any tendency whatsoever to injure Park's reputation or to expose Park to public hatred, contempt, or ridicule, or to injure Park in the maintenance of his business, *see Lyons*, 235 F. Supp. 2d at 1043-44 (so defining defamatory statements), at least where no part of the statement alleges or suggests that the shares were

acquired by fraud, deceit, coercion, or any other underhanded or overreaching conduct, rather than in an arm's length transaction. *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 232 (Iowa 2004) ("We begin our analysis with the observation that '[i]t is for the court, in the first instance to determine whether the words are capable of a defamatory meaning, and for the jury to determine whether they were so understood.'") (quoting *Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 553 (Iowa 1972), and also citing RESTATEMENT (SECOND) OF TORTS § 614 (1977)). The remaining statements, however, are at least marginally capable of a defamatory meaning. *Id.* Therefore, this case must proceed, if at all, on the strength of the other three allegedly defamatory statements.

### 2. *"Opinion" and "truth"*

Not all potentially defamatory statements will give rise to a claim for defamation, however, because "[o]pinion is absolutely protected under the First Amendment.'" *Kiesau*, 686 N.W.2d at 177 (quoting *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989)). The Iowa Supreme Court has "adopted various factors to determine whether a statement is fact or opinion," consisting of the following:

> 1. The precision and specificity of the statement;
> 2. The verifiability of the statement; and
> 3. The literary context in which the statement was made.

*Id.* (citing *Jones*, 440 N.W.2d at 891). The court has explained that "[t]he third factor, literary context, includes the 'social context,' which focuses on the category of the publication, its style and intended audience, and the 'political context' in which the statement was made." *Id.* Similarly, "[t]ruth is a complete defense to defamation." *Delaney v. International Union UAW Local No. 94*, 675 N.W.2d 832, 843 (Iowa 2004) (citing *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996)). Thus, a defamation claim may be defeated by proof that the statements were true. The court may return to the

questions of whether Hill's statements were either "opinions" or "truth," if necessary, below.

### 3.    *Qualified privilege*

A defamation claim may also be defeated by proof that the statements were "qualifiedly privileged." *Lyons*, 235 F. Supp. 2d at 1046 ("'Qualified privilege provides immunity [to defamation claims] in some but not all instances.'") (quoting *Taggart v. Drake Univ.*, 549 N.W.2d 796, 803 (Iowa 1996)). As the Iowa Supreme Court recently explained,

> The law affords defendants privileges because
> [s]ometimes one is justified in communicating to others, without liability, defamatory information. . . . The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous. When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.
>
> *Vojak v. Jensen*, 161 N.W.2d 100, 105 (Iowa 1968); *see Mills*, 245 Iowa at 587, 63 N.W.2d at 224 ("The doctrine of privileged communication is based upon the principle of good public policy. . . . It rests upon the same basis of necessity that is found in other tort laws. Instances abound where the individual must surrender his personal rights and suffer loss for the benefit of the common welfare.").

*Barreca*, 683 N.W.2d at 117. While the qualified privilege exception remains part of Iowa defamation law, the court finds that much else about the definition of the privilege under Iowa law has changed. The changes concern the requirements both to prove and to defeat the qualified privilege.

### a. Invoking the qualified privilege

This court previously stated that "[t]he elements of a qualified privilege defense are that (1) the statements were made in good faith; (2) the defendant had an interest to be upheld; (3) the statements were limited in their scope to this purpose; (4) the statements were made on a proper occasion; and (5) publication was in a proper manner and to proper parties only." *Hill v. Hamilton County Public Hosp.*, 71 F. Supp. 2d 936, 953-54 (N.D. Iowa 1999) (citing *Knudsen v. Chicago & North Western Transp. Co.*, 464 N.W.2d 439 (Iowa 1990) (citing *Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 552 (Iowa 1972)); *Lyons*, 235 F. Supp. 2d at 1046 (quoting *Hill*); *accord Taggart*, 549 N.W.2d at 803 ("Qualified privilege attaches to communications made (1) in good faith, (2) concerning a subject matter in which the speaker has an interest, right, duty, or obligation, and (3) to a listener who has a corresponding interest, right, duty, or obligation in the subject matter of the communication."). However, in *Barreca v. Nickolas*, 683 N.W.2d 111 (Iowa 2004), the Iowa Supreme Court explained that it no longer frames the issue of the application of a "qualified privilege" in this way. *Barreca*, 683 N.W.2d at 118. Instead, the court's task "is simply to determine whether the occasion of [the defendant's] statement was qualifiedly privileged; if the occasion was so privileged, it must then be determined whether that privilege was abused." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 593). The court explained, further, that "[g]enerally, the former question is for the judge; the latter for the jury." *Id.* (citing *Children v. Shinn*, 168 Iowa 531, 549, 150 N.W. 864, 869 (1915), which stated, "It was for the court to say whether or not the occasion was privileged, but as the privilege was a qualified one, it was for the jury to say under proper instructions whether or not the defendant abused his privilege.")

### b.    *Defeating the qualified privilege*

Similarly, this court previously noted that the "qualified privilege" may be lost, if "the statements are not made in good faith, or are made with actual malice." *Lyons*, 235 F. Supp. 2d at 1046 (internal citations omitted).  The Iowa Supreme Court's reformulation of qualified privilege law is still in accord with this principle, because the Iowa Supreme Court reiterated in *Barreca* that "[a] qualified privilege is a defeasible immunity from liability; that is, a qualified privilege may be defeated under certain circumstances," and indeed, that "[a] qualified privilege is lost when it is abused for example, when a defamatory statement is published with 'actual malice.'" *Barreca*, 683 N.W.2d at 118 . However, in *Barreca*, the Iowa Supreme Court changed—or fixed once and for all—the definition of "actual malice" for purposes of determining whether a "qualified privilege" had been abused.

This court had previously explained that "[a]ctual malice in this context 'depend[s] on the motive for the statement'"; thus, it "'requires proof that the statement was made with malice in fact, ill-will or wrongful motive.'" *Lyons*, 235 F. Supp. 2d at 1046. (*Haldeman v. Total Petroleum, Inc.*, 376 N.W.2d 98, 103-04 (Iowa 1985)).  In *Barreca*, however, the Iowa Supreme Court called this definition the "old common law 'wrongful motive' definition of actual malice, which we have long but somewhat inconsistently applied to determine whether a defendant has abused a qualified privilege." *Barreca* 683 N.W.2d 111, 119 (Iowa 2004) (citing cases, including *Haldeman*).    After due consideration, the Iowa Supreme Court "discard[ed] the old common law wrongful motive standard, and adopt[ed]—by analogy—the *New York Times* 'knowing or reckless disregard' definition of 'actual malice' as the standard to be applied to determine whether a defendant has abused a qualified privilege." *Id.* at 121.  Thus, in Iowa, "to defeat a qualified

privilege, a plaintiff must [now] prove the defendant acted with knowing or reckless disregard of the truth of the statement." *Id.*

Notwithstanding that the standard for "actual malice" necessary to defeat a "qualified privilege" has changed, it appears that the law in Iowa continues to be that, in the absence of actual malice, "[e]ven untrue statements may be qualifiedly privileged." *Marks v. Estate of Hartgerink*, 528 N.W.2d 539, 546 (Iowa 1995), *expressly abrogated only on other grounds by Barreca*, 683 N.W.2d at 119. Thus, notwithstanding that there are several interesting and very close issues raised in this case—including whether the statements at issue are defamatory *per se*, or even defamatory at all; whether the statements are "opinions" or "true"; and whether Park, as the president of the only local bank in Garner, Iowa, is a "public figure" considering all of the circumstances of this case—if Hill's statements in the October 1, 2002, letter were qualifiedly privileged, the court need not reach those other interesting issues.

### C. Were Hill's Statements Qualifiedly Privileged?

In light of *Barreca* and the parties' arguments on Hill's motion for summary judgment, the court finds that the dispositive issue here is whether or not Hill's statements in the October 1, 2002, letter were qualifiedly privileged. *See Barreca*, 683 N.W.2d at 118 (the court's task, when the issue of "qualified privilege" arises "is simply to determine whether the occasion of [the defendant's] statement was qualifiedly privileged; if the occasion was so privileged, it must then be determined whether that privilege was abused.") (citing RESTATEMENT (SECOND) OF TORTS § 593). This determination is for the court. *Id.* (the question of whether allegedly defamatory statements are qualifiedly privileged is "[g]enerally . . . for the judge").

## 1. Privileged "occasions"

In *Barreca*, although the court eschewed the multi-element test for determining whether a "qualified privilege" applies to allegedly defamatory statements, the court did examine its prior precedents to determine the circumstances in which persons like the defendant were entitled to a qualified privilege. *See id.* 118-19 (so determining the applicability of the "qualified privilege" for subordinate legislative bodies). Unfortunately, the parties have cited no cases, and this court has found no Iowa or other decisions, considering allegedly defamatory statements made in the context of a hostile takeover, share tender offer, or corporate buyout.

Nevertheless, even in the absence of similar cases, the court is not without guidance. In *Barreca*, the court relied on RESTATEMENT (SECOND) OF TORTS § 593 for its reformulation of the inquiry to determine the applicability of a "qualified privilege" into consideration of whether the matter was published upon a "privileged occasion." *See id.* at 118. Comment *a* to § 593 of the RESTATEMENT (SECOND) OF TORTS, in turn, states that "[t]he rules describing occasions that give rise to a conditional privilege are stated in §§ 594 to 598A." RESTATEMENT (SECOND) OF TORTS § 593, cmt. *a*. It follows from the adoption of § 593 in *Barreca* that the Iowa Supreme Court would also look to these sections of the RESTATEMENT for the description of specific "privileged occasions." Therefore, this court will consider whether any of the "privileged occasions" identified in RESTATEMENT (SECOND) OF TORTS §§ 594 to 598A were present in this case as a matter of law.

The provisions of the RESTATEMENT (SECOND) OF TORTS that the court finds define potentially applicable "privileged occasions," based on the parties' arguments and the record presented, are § 594, which describes the "protection of the publisher's interest" occasion, and § 596, which describes the "common interest" occasion. Park asserts that

the pertinent section is § 594, but that the circumstances at issue ultimately do not fit the "privileged occasion" described therein. Although Hill did not frame his argument in terms of specific sections of the RESTATEMENT, his privilege argument nevertheless invokes the "common interest" occasion defined in § 596. The court will consider both of these "privileged occasions."

### a. The "protection of the publisher's interest" privileged occasion

*i.* ***Section 594.*** Park's nominee for the RESTATEMENT provision that defines a potentially applicable "privileged occasion" for Hill's allegedly defamatory statements is § 594, which states the following:

### § 594. Protection of the Publisher's Interest

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
> (a) there is information that affects a sufficiently important interest of the publisher, and
> (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

RESTATEMENT (SECOND) OF TORTS § 594. The comments to this section of the RESTATEMENT provide further illumination of the two requirements of this "privileged occasion."

First, as to the "interest of the publisher" requirement in Clause (a), comment *d* to § 594 explains that the interest in question must be "directly or indirectly" protected by law. RESTATEMENT (SECOND) OF TORTS § 594, cmt. *d*. To determine whether an interest is sufficiently important to receive indirect legal protection, the court must make "a comparison of the advantages to the publisher's interest if the defamatory matter should be true, with the harm that will be done to the other's reputation, if the defamatory matter should prove to be false." *Id.*, cmt. *e*. In conducting such a comparison, "the fact that

the person publishing it has reason to believe that no action will be taken by the recipient in reliance upon it until he has investigated its truth is a factor that may be important in an appropriate case." *Id.* Comments *f* and *g* identify the interests that may be protected by defamatory statements and the insufficiency of a competitive interest to invoke the privilege, respectively, as follows:

> F. *Interests that may be protected by defamatory statements.* Any lawful pecuniary interest of the publisher, other than his interest in competition for prospective pecuniary benefits, comes within Clause (a), as does his interest in bodily security. Thus his interest in land, chattels or intangible things, when it is a present interest, is a proper matter for the exercise of the conditional privilege. So too, a family or group interest is sufficiently important to come within Clause (a), although the interest could not be directly protected by a cause of action for damages against one who invades the interest. On the other hand, the mere desire to hear or disseminate idle gossip is of little social value and therefore not within Clause (a).
>
> g. *Competition.* The interest in competition for prospective advantage, of which the obvious illustration is that of one businessman who, in order to acquire customers for himself, personally defames another, is not within Clause (a). The interest is not one that is entitled to this type of protection, and whatever importance and value it may have from a social point of view, the recognized necessity of keeping competitive methods within "fair" and reasonable bounds excludes personal defamation as a legitimate means of depriving a rival of potential benefits. (Cf. § 766B, 768).

RESTATEMENT (SECOND) OF TORTS § 594, cmts. *f* & *g*; *see also Mid-America Food Serv., Inc. v. ARA Servs., Inc.*, 578 F.2d 691, 701 (8th Cir. 1978) (noting that, under Kansas defamation law, a party was not privileged to make defamatory remarks about a competitor to further a business interest in securing an advantage over that competitor). Finally, as

to the publisher's interest, Comment *h* provides that "it is not necessary that the publisher's interest be actually in danger. It is enough that the circumstances are such as to lead a reasonable man to believe that the interest is in danger and that the defamatory publication is necessary for its protection." *Id.*, cmt. *h*.

As to the requirement in Clause (b) that "the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest," the Comments clarify, in pertinent part, that "it is further necessary that the publication be made to a person, who, if the defamatory matter is true, may *reasonably be expected* to be of service in the protection of the interest." *Id.*, cmt. *i* (emphasis added). Also, "[i]t is enough that the publisher reasonably believes that the recipient is able to render assistance or that his knowledge of the defamatory matter may be useful in the protection or advancement of the interest in question," but "[i]t is not necessary that the recipient actually have the power or ability to assist the publisher." *Id.*

*ii. **Applicability here**.* Although Park asserts that § 594 defines the only potentially applicable "privileged occasion" for Hill's statements, Park contends that Hill cannot demonstrate that such a "privileged occasion" existed as a matter of law in this case. More specifically, Park contends that Hill had no legitimate interest to protect, because at the time that Hill made the allegedly defamatory statements, the board had already voted to accept Liberty's offer and Hill was ready to "back off" his tender offer. Park also contends that this "occasion" does not protect an interest in competition for prospective pecuniary benefits, which is the interest that Hill's defamatory statements were intended to protect. He argues that Hill's defamatory comments, thus, exceeded fair and reasonable bounds. Hill, however, asserts that he had not withdrawn his tender offer and that he had control and a right to retain 26% of the shares of the Bank at the time of the allegedly defamatory statements. He asserts that Park has pointed to nothing that required

him to return the shares under his control if his tender offer was not successful. Thus, he contends that he stood in much the same shoes as other shareholders with regard to Liberty's offer. He contends, further, that these "shareholder" interests are sufficiently important to invoke the privilege. Hill also contends and that his purpose was to urge shareholders to reconsider the deal with Liberty in light of the conduct of Park and the board and that, in any event, he was not "competing" with Park or the board to purchase the Bank, but negotiating with shareholders and the board. Finally, Hill contends that the allegedly defamatory matter would have been of service to shareholders in their determination of whether or not to accept his offer instead of Liberty's offer and, thus, of service to his own interest in who controlled a bank in which he controlled 26% of the shares.

As to the first requirement of § 594—that Hill "correctly or reasonably believe[d] that there is information that affects a sufficiently important interest of the publisher," *SEE* RESTATEMENT (SECOND) OF Torts § 594(a)—the court finds, as a matter of law, that the "control" Hill already exercised over the shares tendered to him was sufficient for him to have a legally protectable "present interest" in those shares, not merely an interest in competition for a "prospective pecuniary benefit." *See* RESTATEMENT (SECOND) OF Torts § 594, cmt. *f.* The court finds that Hill's interest in the shares in his control was a "present interest" in "chattels or intangible things." *Id.* Park has pointed to nothing that required Hill to tender back the shares he controlled, even if the shareholders voted to accept a different offer. Thus, Hill had or reasonably believed that he had the same protectable interests as other shareholders, which included, *inter alia*, an interest in who would control the Bank, the weight of a shareholder's voting interest, and the value of his shares. Hill had these "present interests," whether or not he actually obtained control of the Bank himself. Moreover, such interests would be affected, or Hill reasonably believed

that such interests would be affected, by the matters on which he commented. *See id.*, cmt. *h* (a reasonable belief that the publisher's interest is affected is sufficient).

In contrast, it is only Hill's goal of controlling the Bank himself that could be characterized as an "interest in competition for prospective pecuniary benefits." *See id.*, cmts. *f* (the interest does not extend to "competition for prospective business benefits") & *g* (defining an "interest in competition for prospective advantage"). Even so, Hill's statements were not made at the expense of a *competitor*, such as another bidder for the Bank; rather, his statements were about the persons then running the Bank, who were responsible for exercising their fiduciary duty on behalf of the shareholders in light of offers from competing bidders. Thus, the identity of the allegedly defamed individual does not fit within the prohibition on defamation in "competitive" circumstances identified in either Comment *g* to § 594 or *Mid-American Food Service, Inc. See id.*, cmt. *g* (giving as an example a "competitive" circumstance in which the privilege would not apply as one in which one businessman makes a defamatory statement about another businessman to acquire customers for himself); *Mid-American Food Serv., Inc.*, 578 F.2d at 701 (same).

It is not clear whether Clause (a) of § 594 would include other "prospective pecuniary benefits," if the target of the allegedly defamatory comments was *not* a competitor. The first sentence of Comment *f* excludes only an "interest *in competition for* prospective pecuniary benefits" from protectable "lawful pecuniary interests," not *all* "prospective pecuniary interests," but the second sentence to that Comment requires that an "interest in land, chattels, or intangible things" be "a present interest." *See id.*, cmt. *f* (emphasis added). Assuming, without deciding, that the rationale of RESTATEMENT (SECOND) OF TORTS § 594 and Comments *f* and *g* would nevertheless exclude from the privileged occasion statements in furtherance of *any* "prospective pecuniary advantage," even where the statements are *not* targeted at a competitor, the "privileged occasion"

defined in § 594 is not inapplicable in this case as a result of that interpretation. Rather, where the court has already found that Hill had a *present* interest from his control of 26% of the Bank's shares, reading § 594, or Comments *f* and *g* to prohibit a privilege based on an interest in prospective pecuniary benefits of *any* kind would not negate Hill's "present interest," which does fit within the "privileged occasion" defined by § 594. *See id.* (the speaker's "interest in land, chattels or intangible things, when it is a present interest, is a proper matter for the exercise of the conditional privilege").

Furthermore, the balance of the "likelihood of injury if [the allegedly defamatory statement] proves to be false, as compared to the likelihood of benefit if the matter is true," as required by comment *e*, weighs in favor of applying the privilege here. *See id.*, cmt. *e*. The court finds that a true statement that Park had acted in the way that Hill asserted in the allegedly defamatory statements would likely benefit Hill *and other shareholders* in evaluating who should control the Bank, while the likelihood of injury if the statements were false was relatively small, because Hill had "reason to believe that no action w[ould] be taken by the recipient[s] in reliance upon [his statements] until [the recipients had] investigated [their] truth." *Id.*, cmt. *e*. Indeed, taking Hill's allegedly defamatory statements in context, Hill's October 1, 2002, letter seemed to invite shareholders to make such an investigation, because Hill noted therein, "Since the proposed transaction with Liberty Bank must still receive shareholder and regulatory approval (neither of which are assured) and since there are a significant number of shareholders, who, once they realize that your Board of Directors has avoided its responsibility and ignored the desire of the majority of the shareholders of the Bank to remain as a locally owned and independent bank, this proposal may still fail." Defendant's Appendix, Exhibit 18.

Turning to the requirements of Clause (b) of § 594—that "the circumstances induce a correct or reasonable belief that . . . the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest," *see* RESTATEMENT (SECOND) OF TORTS § 594(b)—the court also finds that, as a matter of law, the allegedly defamatory statements at issue here were communicated only to appropriate recipients who could be of service in protecting Hill's interest and, indeed, the information would reasonably have been believed to be of service to protection of the recipients' interest. The other shareholders were persons who, "if the defamatory matter [was] true, [might] reasonably be expected to be of service in the protection of the interest" in who controlled the Bank. *Id.*, cmt. *i*. This is so, because the shareholders could ultimately control the sale of the Bank, and Hill "reasonably believe[d] that the recipient[s] [were] able to render assistance or that [their] knowledge of the defamatory matter [might have been] useful in the protection or advancement of the interest in question." *Id.*

Because the court finds that the requirements of both clauses of § 594 are met in this case, Hill's allegedly defamatory statements were, as a matter of law, qualifiedly privileged pursuant to § 594 of the RESTATEMENT. *See Barreca*, 683 N.W.2d at 118 (whether allegedly defamatory statements were published on a "privileged occasion" is "[g]enerally . . . for the judge").

### b. The "common interest" privileged occasion

*i.* **Section 596**. The court's discussion of "privileged occasions" does not end with the "publisher's interest" occasion defined in § 594, because Hill repeatedly asserted a "common interest" privilege for his October 1, 2002, letter, owing to what he contends was his "common interest" with the shareholders to whom he sent that letter. Although Hill did not cite the pertinent provision of the RESTATEMENT, his arguments necessarily

invoke the "common interest" privileged occasion defined, as follows, in RESTATEMENT (SECOND) OF TORTS § 596:

### § 596.        Common Interest

> An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.

RESTATEMENT (SECOND) OF TORTS § 596. This privilege is not applicable when the privilege defined in § 594 is applicable, as explained in Comment *c*:

> *c.*        The privilege arising out of the rule stated in this Section is not necessary when the defamatory matter is communicated for the purpose of protecting a sufficiently important interest that the publisher and the recipient have in common. If the defamatory matter is published for this purpose the publication is privileged under the rule stated in § 594 or that stated in § 595 [protection of interest of recipient or a third person].

*Id.*, cmt. *c*. Nevertheless, assuming for the sake of argument that the privilege defined in § 594 is *not* applicable, the court will consider the applicability of § 596 in the alternative.

Comment *c* continues with an explanation of the difference between § 596 and § 594:

> Under the rule of this Section it is *not* necessary to the existence of the privilege stated that the defamatory matter be published *for the protection of the common interest*. The rule is based on the fact that one is entitled to learn from his associates what is being done in a matter in which he has an interest in common with them. This interest in their common affairs entitles him to information as to how they are conducted, or to information that affects the common interest,

> even though he is not personally concerned with the
> information.

*Id.* (emphasis added).  Thus, while § 594(b) requires that the recipient be someone that the publisher reasonably believes will find the information conveyed to "be of service in the lawful protection of the interest," *see* RESTATEMENT (SECOND) OF TORTS § 594(b), there is no such requirement under § 596.  Instead, § 596 merely requires that the allegedly defamatory matter relate to a "matter in which [the recipient] has an interest in common with [his associates]."  RESTATEMENT (SECOND) OF TORTS § 596.

Among the few specific examples of a § 596 "privileged occasion" offered in the Comments to this section is "fellow shareholders."  *Id.*, cmt. *d*.  More generally, Comment *c* clarifies that "[i]t is not necessary that the communication be made at an official meeting of the group, or that it take the form of any official action on the part of the group or its representatives."  *Id.*, cmt. *c*.  Rather, "[a] purely private communication between members of the group is privileged, if it meets the requirements stated in this Section."  *Id.*  Thus, a shareholder can invoke this privileged occasion for a comment to other shareholders on a matter of "common interest" that is made in a private communication among them.

*ii.*    ***Applicability here***.  Hill contends that, because he controlled 26% of the shares of the Bank at the time of the October 1, 2002, letter, he stands in a position at least analogous to a "fellow shareholder" with the others to whom he sent that letter.  He also contends that he and the shareholders to whom he sent the letter had, or he reasonably believed that they had, a "common interest" in the "particular subject matter" of the conduct of the sale of the Bank by Mr. Park and the Board.  Park again contends that Hill had no "common interest" with other shareholders, because his tender offer had been

rejected and another offer had been accepted, and Hill testified that he was ready to "back off" his attempt to acquire the Bank.

Although the requirements for a § 596 privilege are somewhat different from the requirements for a § 594 privilege, much of what was said above regarding the "protection of a private interest" privileged occasion also applies here. Because Hill had control of and the right to retain 26% of the shares of the Bank at the time he made the allegedly defamatory statements, and Park has pointed to nothing that required Hill to return the shares he controlled if his tender offer was not successful, Hill stood in much the same shoes as other shareholders with regard to Liberty's offer or a sale to any other bidder. Hill contends that the subject of the conduct of Park and the board with regard to the sale of the Bank was plainly a matter of "common interest" to the shareholders, and the court agrees. Hill was not required to show that "the defamatory matter [was] published for the protection of the common interest"; rather, "[t]he rule [of § 596] is based on the fact that one," such as a shareholder, "is entitled to learn from his associates," such as other shareholders, "what is being done in a matter in which he has an interest in common with them," such as the sale of the Bank in which they held shares. *Id.*, cmt. *c*. Still more specifically, "[t]his interest in their common affairs entitles [a shareholder] to information as to how they are conducted, or to information that affects the common interest, even though he is not personally concerned with the information." *Id.* Hill's allegedly defamatory statements conveyed "information as to how [the affairs of the Bank were] conducted," as well as information about the conduct of Park and the Board in the sale of the Bank, which "affect[ed] the common interest." *Id.* Finally, Hill conveyed the information in question in the form of "[a] purely private communication between members of the group," thus satisfying the circumstances in which allegedly defamatory statements may be published and still fall within the privileged occasion defined in § 596.

Therefore, Hill's allegedly defamatory statements were, as a matter of law, made on a "privileged occasion" within the meaning of § 596. *See Barreca*, 683 N.W.2d at 118 (whether allegedly defamatory statements were published on a "privileged occasion" is "[g]enerally . . . for the judge").

### 2. *Abuse of the privilege*

Having concluded that the allegedly defamatory statements at issue here fall within at least one "privileged occasion," the court turns to the question of whether the privilege thus arising was abused. *See Barreca*, 683 N.W.2d at 118. This question is generally for the jury. *Id.* However, on a motion for summary judgment, the question is whether the party opposing summary judgment has generated a genuine issue of material fact for a jury to decide on this issue. FED. R. CIV. P. 56(e) (when a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324; *Rabushka*, 122 F.3d at 562; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325.

Again, as clarified by the Iowa Supreme Court in *Barreca*, "[a] qualified privilege is lost when it is abused for example, when a defamatory statement is published with 'actual malice.'" *Barreca*, 683 N.W.2d at 118. The court in *Barreca* has, further, fixed once and for all the definition of "actual malice" in the context of defeating a "qualified privilege" to mean that the plaintiff must prove that the publisher "acted with knowing or reckless disregard of the truth of the statement." *Id.* at 121.

Hill contends that he did not abuse the privilege either by acting in "bad faith" or by acting with "actual malice." He contends that he disseminated the October 1, 2002, letter only to persons that he reasonably believed to be shareholders and that he cannot be

held responsible for any republication to members of the public. He contends, further, that no legitimate argument can be made that he knew the statements in the letter were false or made them with reckless disregard for their truth or falsity, when the letter was not drafted in haste, but after consultation with counsel, and he had more than adequate reasons to believe that his statements were true. Park counters that Hill did not act in "good faith," because his "fresh approach" had not increased his offer and had not been greeted well by shareholders, so that he was ready to "back off" at the time that he made the allegedly defamatory statements. In these circumstances, Park contends that Hill, nevertheless, decided to defame Park, apparently out of vindictiveness, rather than in an attempt to salvage his bid. Thus, Park contends that Hill's "contradictory" conduct undermines his purported "good faith" in making the allegedly defamatory statements. Park also contends that Hill's complaints that Park impeded Hill's attempts to contact shareholders or directors or to obtain financial or other information about the Bank do not ring true, when Hill made no attempt to obtain more financial information or to contact more than three directors, and Hill had access to shareholders. Moreover, contrary to Hill's assertion that Park breached his fiduciary duty, Park contends that Hill had previously lauded Park's concern for the shareholders. All in all, Park contends that the record shows that Hill's statements were made in reckless disregard for their truth.

### a.    *Bad faith*

The court finds that Park has failed to generate a genuine issue of material fact on Hill's purported abuse of the applicable qualified privilege. First, as to "bad faith," the court concludes that no reasonable juror could find that Hill's statements or conduct are so "contradictory" as to undermine the "good faith" of his statements. Nor could any reasonable juror find that Hill intentionally published the allegedly defamatory statements to the general public. While Hill may have been ready to "back off" his tender offer at

the time of the October 1, 2002, letter, he had not withdrawn the offer, nor had Liberty's offer been approved by the shareholders, so he was not acting in "bad faith," as a matter of law, simply because he was continuing his attempts to acquire the Bank. Moreover, his "present interest" in the control of the Bank and the conduct of Park and the board, arising from Hill's control of 26% of the shares, gave Hill a "good faith" basis, as a matter of law, for commenting on the conduct of Park and the board concerning their efforts to sell the Bank. Nor can the court find that Park has generated a genuine issue of material fact as to "bad faith" in Hill's refusal to increase his offer per share, where Hill has shown that he lacked any financial information that would necessarily have warranted an increase, and that he reasonably believed that other aspects of his offer, including the opportunity to retain local control of the Bank, offset any price differential.

### b. *Actual malice*

Perhaps more critically, the court finds that Park has not generated a genuine issue of material fact that Hill could not have reasonably believed that his allegedly defamatory statements were true, such that he acted with "reckless disregard" for the truth of his statements. *See Barreca*, 683 N.W.2d at 121 (clarifying that the proper definition of "actual malice" in the context of defeating a "qualified privilege" is that the publisher "acted with knowing or reckless disregard of the truth of the statement"). As to the first allegedly defamatory statement, that "Richard Park, prevented [Hill] from having any contact with the Board of Directors of the Bank," *see* Defendant's Appendix, Exhibit 18 (allegedly defamatory letter); Complaint (docket no. 1), ¶ 9 (cataloguing allegedly defamatory statements in the October 1, 2002, letter), the statement does not center on Hill's ability to contact individual directors, as Park seems to read it, but on Hill's ability to contact "the Board of Directors," *i.e.*, as a group or as a whole. *Id.* Nevertheless, Hill has pointed to evidence that the only two directors, besides Park, that Hill attempted to

43

contact rebuffed his overtures, so that Hill could reasonably have believed that Park had impeded his access to directors to the point where no further attempts to talk to directors would be fruitful. Plaintiff's Supplemental Appendix at 20 (Hill's testimony about attempts to contact directors). Moreover, Hill's impression that he was never allowed to meet with the board *as a group* was reasonably based on the board's refusal of his request to attend a board meeting to discuss his offer. Plaintiff's Supplemental Appendix at 88 (Minutes of September 12, 2002, board meeting reflecting that the board had decided not to meet with Hill). It also became clear to Hill that he had not been "invited to the party," when his requests for financial information were rebuffed—and, indeed, the record now shows that Mr. Hagen was instructed not to give Hill the "bid book"—but other bidders were given such information, furthering the reasonableness of Hill's belief that he was being locked out of negotiations with the board. Defendant's Appendix, Exhibit 10 (deposition testimony of Mr. Hagen).

Similarly, as to the second allegedly defamatory statement, that Park "impeded any discussions between [Hill] and shareholders of the Bank," *see* Defendant's Appendix, Exhibit 18 (allegedly defamatory letter); Complaint (docket no. 1), ¶ 9 (cataloguing allegedly defamatory statements in the October 1, 2002, letter), the evidence to which Hill points shows that Park and the board refused to provide Hill or a shareholder who favored Hill's bid with a current list of shareholders, so that Hill was required to work off of a very out-of-date list of shareholders to try to contact all interested parties. Plaintiff's Supplemental Appendix at 17 (Hill's deposition testimony concerning refusal of Bank officials to provide a shareholder with a current list of shareholders). The record also shows that the board voted to try to encourage shareholders not to accept Hill's bid and not to negotiate with him, and further, to keep that strategy a secret so that Hill could not respond to it. *See* Defendant's Appendix, Exhibit 5 (Minutes of June 5, 2002, meeting)

(the board "decided the best possible strategy would be to ask shareholders to sign an agreement whereby they would agree not to tender their shares to David Hill and [to] act cooperatively in marketing their stock for fair market value," and to keep this effort confidential, to prevent Hill from responding to it). Thus, Hill could reasonably have believed that Park and the board impeded his access to shareholders.

As to the fourth allegedly defamatory statement,[4] that "[Shareholders] should feel free to communicate to the [B]ank [their] disappointment with the direction taken by [the] Board of Directors and their evident lack of responsibility and sensitivity to the real concerns of the bank's shareholders," *see* Defendant's Appendix, Exhibit 18 (allegedly defamatory letter); Complaint (docket no. 1), ¶¶ 9, 11-18 (cataloguing allegedly defamatory statements in the October 1, 2002, letter), the defamatory inference appears to be that Park and the board had acted irresponsibly and insensitively to the concerns of shareholders, which might suggest that they acted in breach of their fiduciary duty. However, all of the evidence catalogued above, in reference to the other two allegedly defamatory statements, was plainly sufficient for Hill to believe that he had been shut out of the bidding process, despite the interests of shareholders, for example, in retaining some separate identity for and local control of the Bank, which he had discovered from discussions with the shareholders that he had been able to contact.

While Park may have identified evidence suggesting that Hill was wrong, and that his statements were not categorically true, Park has not pointed to any evidence generating a genuine issue of material fact that Hill could not reasonably have believed that the challenged statements to be true. *Celotex Corp.*, 477 U.S. at 323 (if a party fails to make

---

[4]The court held, above, that the third allegedly defamatory statement was not capable of a defamatory meaning as a matter of law. *See Lloyd*, 686 N.W.2d at 232.

a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"). As a matter of law, Hill's statements were not made in knowing or reckless disregard of their truth, so that Park cannot show that Hill made the statements with "actual malice." *Barreca*, 683 N.W.2d at 121 (a publisher of a statement acted with "actual malice" in the context of defeating a "qualified privilege" if the publisher "acted with knowing or reckless disregard of the truth of the statement").

Therefore, in the circumstances of this case, Park cannot defeat Hill's qualified privilege as a matter of law, and Hill is entitled to summary judgment on Park's defamation claim.

## III. CONCLUSION

The court finds that, as a matter of law, one of the allegedly defamatory statements at issue in this case simply is not capable of a defamatory meaning. As to the remaining statements, the court finds that, as a matter of law, each is subject to either the "protection of the publisher's interest" qualified privilege defined in RESTATEMENT (SECOND) OF TORTS § 594 or the "common interest" qualified privilege defined in RESTATEMENT § 596. Plaintiff Park has failed to generate a genuine issue of material fact that defendant Hill abused the qualified privilege for his statements, by generating an inference of "bad faith" or "actual malice," as "actual malice" has been categorically defined by the Iowa Supreme Court in *Barreca v. Nickolas*, 683 N.W.2d 111 (Iowa 2004). Under these circumstances, defendant Hill is entitled to summary judgment on plaintiff Park's defamation claim.

THEREFORE, defendant Hill's March 4, 2005, Motion For Summary Judgment on plaintiff Park's defamation claim (docket no. 60) is **granted**. Judgment shall enter accordingly.

**IT IS SO ORDERED.**

**DATED** this 8th day of August, 2005.

Mark W. Bennett

_____

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA